UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————

No. 13 Civ. 900 (RJS)

———————————

GREENLIGHT CAPITAL, L.P., *et al.*,

Plaintiffs,

VERSUS

APPLE, INC.,

Defendant.

———————————

No. 13 Civ. 976 (RJS)

———————————

BRIAN GRALNICK,

Plaintiff,

VERSUS

APPLE, INC.,

Defendant.

———————————

MEMORANDUM AND ORDER
February 22, 2013

———————————

RICHARD J. SULLIVAN, District Judge:

In preparation for its annual shareholder meeting, Defendant Apple, Inc. ("Apple") issued a definitive proxy statement (the "Proxy Statement") and proxy card (the "Proxy Card") soliciting shareholder votes on a range of proposals. Plaintiffs Greenlight

Capital, L.P.; Greenlight Capital Qualified, L.P.; Greenlight Capital Gold, L.P.; Greenlight Capital Offshore Partners; and Greenlight Capital Offshore Master Gold, Ltd. (collectively, "Greenlight") assert that Proposal Number 2 of the Proxy Statement and Proxy Card violates the "unbundling" rules promulgated by the Securities and Exchange Commission ("SEC"), which require that a proxy permit shareholders to vote separately on each matter presented for consideration. Plaintiff Brian Gralnick ("Gralnick"), in addition to bringing his own bundling claim with respect to Proposal Number 2, asserts that Proposal Number 4 of the Proxy Statement and Proxy Card violates the "say-on-pay" rules promulgated by the SEC, which require disclosure of factors affecting executive compensation. Before the Court are Greenlight's and Gralnick's motions seeking to preliminarily enjoin Apple from giving effect to the challenged votes. For the reasons that follow, the Court grants Greenlight's and Gralnick's motions regarding Proposal Number 2, but denies Gralnick's motion regarding Proposal Number 4.

I. Facts[1]

A. Background

Apple, the technology giant, is a California corporation with its principal place of business in California and a permanent office in New York. (Green. Compl. ¶¶ 8, 11; Gral. Compl. ¶ 10.) Its stock is traded on the NASDAQ under the symbol AAPL. (Green. Mem. 3.) The Greenlight entities are three limited partnerships, a partnership, and a limited liability company, all with their principal places of business in New York. (Green. Compl. ¶¶ 2-6.) Greenlight owned 1.3 million Apple shares as of January 2, 2013, the record date for Apple's shareholder meeting. (*Id.* ¶ 7.) Gralnick, an individual, has been an Apple shareholder since 2007. (Gral. Compl. ¶ 9.)

In preparation for its annual shareholder meeting, scheduled for February 27, 2013, Apple filed a preliminary proxy statement with the SEC on December 27, 2012, and issued the Proxy Statement and Proxy Card to shareholders on January 7, 2013. (Green. Compl. ¶ 12, Ex. A; Gral. Compl. ¶ 11; Tr. Of Oral Arg., dated Feb. 19, 2013 ("Tr."), 35:23.) The proxy materials included six proposals for shareholder consideration, two of which are at issue in this action.

1. Proposal Number 2

Proposal Number 2 in the Proxy Statement ("Proposal No. 2") seeks to amend Apple's Restated Articles of Incorporation (the "Articles"). (Green. Compl. ¶ 13, Ex. A 1, 44-46, 54-61; Gral. Compl. ¶ 14.) Specifically, Proposal No. 2 seeks proxies to:

> [(1)] eliminate certain language relating to the term of office of directors in order to facilitate the adoption of majority voting for the election of directors; [(2)] eliminate "blank check" preferred stock; [(3)] establish a par value for [Apple's] common stock of $0.00001 per share; and [(4)] make other conforming changes . . . , including eliminating provisions in the Articles

---

[1] The facts are taken from Greenlight's Complaint ("Green. Compl.") and Gralnick's Complaint ("Gral. Compl."). In ruling on Plaintiffs' motions, the Court considered Greenlight's memorandum of law ("Green. Mem."); Apple's opposition brief ("Opp'n to Green."); and Greenlight's reply brief ("Green. Reply"); as well as Gralnick's memorandum ("Gral. Mem."); Apple's opposition ("Opp'n to Gral."); and Gralnick's reply ("Gral. Reply"); along with the declarations and exhibits attached thereto.

2

relating to preferred stock of [Apple].

(Green. Compl. Ex. A 44.) The first item in Proposal No. 2 would facilitate majority voting for incumbent members of Apple's Board of Directors (the "Board") under California law. (*Id.* at 45.) Though Apple shareholders endorsed majority voting in 2011, and the Board acceded in 2012, the amendment is necessary to conform the Articles to state law. (Opp'n to Green. 16.) The second item would revoke the Board's power to unilaterally issue preferred stock – that is, stock providing greater rights and privileges than Apple common stock – thereby requiring shareholder approval of any future issuance. (Green. Compl. Ex. A 45.) The third item would establish a nominal par value for Apple's common stock in an attempt to avoid state fees stemming from Apple's no-par shares. (*Id.* at 45-46.) The final item would eliminate certain obsolete provisions in the Articles. (*Id.* at 46.)

The history of Proposal No. 2 is a contentious one. Presently, Apple's Board has the authority to unilaterally issue preferred stock. (*See* Opp'n to Green. 5-6.) This power – commonly referred to as "blank check" authority – has been derided by shareholder rights advocates given its potential use as an anti-takeover tactic, and a number of companies have removed such provisions from their charters. (*Id.*) In May 2012, Apple began the process of eliminating the provision from its Articles. (*Id.* at 7.) However, that same month, Greenlight principal David Einhorn ("Einhorn") approached Apple with a proposal to utilize its "blank check" power. (Decl. of David Einhorn, dated Feb. 6, 2013, Green. Doc. No. 6 ("Einhorn Decl. Feb. 6"), ¶ 3.) In a conference call, Einhorn encouraged Apple to issue perpetual preferred shares to its existing shareholders in a bid to return value to Apple investors. (*Id.*) Nevertheless, in September 2012, Apple rejected Einhorn's proposal and instead moved forward with the planned elimination. (*Id.*; Opp'n to Green. 9.)

On February 1, 2013, Greenlight urged Apple to withdraw the "blank check" amendment. (Green. Compl. ¶ 18.) On February 5, 2013, Greenlight reiterated its request and, in the alternative, pressed Apple to break up Proposal No. 2 into separate voting items given Greenlight's support for at least two of the four amendments. (*Id.*; Einhorn Decl. Feb. 6 ¶¶ 10-11.) Apple declined. (Einhorn Decl. Feb. 6 ¶ 12.) Accordingly, Greenlight filed suit on February 7, 2013, alleging that the up-or-down vote on Proposal No. 2 violated SEC Rules 14a-4(a)(3) and (b)(1). (Green. Compl. ¶ 15); *see* 17 C.F.R. § 240.14a-4(a)(3), (b)(1). Gralnick followed suit on February 12, 2013, advancing similar claims. (Gral. Compl. ¶ 15; Decl. of Brian Gralnick, dated Feb. 12, 2013, Gral. Doc. No. 15 ("Gralnick Decl."), ¶ 4.)

2. Proposal Number 4

Proposal Number 4 in the Proxy Statement ("Proposal No. 4"), or the "say-on-pay proposal," seeks "advisory vote[s] to approve the compensation of [Apple's] named executive officers." (Green. Compl. Ex. A 47.) Though Apple's 2012 executive compensation has already been paid, the "say-on-pay" vote permits shareholders an opportunity to express their opinion on Apple's compensation program. (*Id.* at 49.) The outcome of the vote may also inform Apple's "future compensation decisions." (*Id.*) To provide a basis for the vote, and pursuant to SEC disclosure rules, the Proxy Statement details Apple's executive compensation in a sixteen-page report called

3

the Compensation Discussion and Analysis ("CD&A"). (*See id.* at 25-42.) The CD&A, *inter alia*, lists the elements of Apple's compensation for named executives; discusses the purpose of each element and the method of award; describes Apple's philosophy for awarding compensation, with a focus on "exceptional personal performance" and "internal equity"; provides an assessment of the company's performance; lists the members of the Compensation Committee as well as their backgrounds and qualifications; emphasizes the weight given to the input of Apple CEO Tim Cook ("Cook") concerning the performance and compensation of the named executives; and catalogs the peer firms considered in connection with Apple's compensation decisions as well as the criteria used to select those firms. (*Id.*)

Among the elements of executive compensation listed in the CD&A are "[l]ong-term equity awards in the form of [restricted stock units, or] RSUs[, which] constitute the majority of each named executive officer's total compensation opportunity." (*Id.* at 48; *see id.* at 29.) Regarding the award of RSUs, the CD&A states that:

> The Compensation Committee's determination of the size of the RSU awards was a subjective determination. The Compensation Committee believed that the RSU awards should be meaningful in size in order to retain [Apple's] executive team during the CEO transition. There was no formula or peer group "benchmark" used in determining these awards. Rather, the size of the awards was the result of the Compensation Committee's business judgment, which was informed by the experiences of the members of the Committee, the Committee's assessment of [Apple's] performance, the input received from [Apple CEO] Cook, as well as the input and peer group data provided by [Apple's executive compensation consultant].

(*Id.* at 30.) The CD&A also discloses that, in November 2011, four Apple executives were granted 150,000 RSUs each, totaling approximately $60 million per executive on the date of the grant.[2] (*Id.*; Gral. Compl. ¶ 25.)

On February 12, 2013, in addition to his bundling complaint, Gralnick filed a claim that Proposal No. 4 violates SEC disclosure requirements on the ground that Apple's use of terms like "experiences," "input," and "peer group data" fails to provide an intelligible basis for shareholders to judge Apple's executive compensation decisions, particularly the sizeable RSU awards. (Gral. Compl. ¶¶ 22-23); *see* 17 C.F.R. § 229.402(b)(1)(v).

B. Procedural History

Greenlight filed its Complaint on February 7, 2013, alleging violations of Section 14 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n, and Rules 14a-4(a)(3) and (b)(1) promulgated thereunder. (Green. Compl. ¶ 24); *see* 17 C.F.R. § 240.14a-4(a)(3), (b)(1). That day, Greenlight also moved by Order to Show Cause for a Preliminary Injunction to enjoin Apple from (1) certifying or accepting proxy votes cast in connection with Proposal No. 2, (2) amending its Articles based on such votes, or (3) proceeding with its shareholder

---

[2] Though granted in 2011, the RSU awards are considered by Apple to be part of its 2012 executive compensation. (*Id.* at 31.)

meeting in violation of SEC rules. (Green. Doc. No. 1.)

On February 13, 2013, Gralnick brought a similar action pursuant to Section 14 of the Exchange Act; Rules 14a-4(a)(3) and (b)(1); and SEC Regulation S-K, Item 402(b)(1)(v). Gralnick seeks identical relief to that sought by Greenlight with respect to Proposal No. 2, and seeks to enjoin Apple from certifying or accepting proxy votes cast in connection with Proposal No. 4, or from proceeding with its shareholder meeting in violation of SEC rules regarding the "say-on-pay" vote. (Gral. Compl. ¶¶ 2-3); *see* 17 C.F.R. § 229.402(b)(1)(v).

Apple filed its opposition to Greenlight's motion on February 13, 2013, and to Gralnick's motion on February 14, 2013. (Green. Doc. No. 13; Gral. Doc. No. 7.) Greenlight and Gralnick both replied on February 15, 2013. (Green. Doc. No. 22; Gral. Doc. No. 20.) The Court heard oral argument on February 19, 2013.

II. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. In the Second Circuit, a plaintiff may satisfy the first element of this inquiry by establishing "either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010). Finally, a plaintiff bears the burden of demonstrating "by a clear showing" that the necessary elements are satisfied. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Failure to satisfy this burden for any one of the elements is fatal to a preliminary injunction claim. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.").

III. DISCUSSION

The dimensions of this dispute extend well beyond the SEC rules invoked in the Complaints: billionaire hedge fund manager Einhorn is at odds with Apple over the future of the company's capital allocation strategy. (*See* Green. Mem. 4; Opp'n to Green. 8-9.) But despite the sweep of the parties' disagreement, the Court's inquiry remains a narrow one: whether Apple's proxy materials "likely" violate the SEC rules governing proxies for shareholder vote, and whether Greenlight and Gralnick will suffer irreparable harm as a result. The parties dispute each of the elements of the preliminary injunction analysis guiding that inquiry. Accordingly, the Court addresses each in turn.

A. Proposal No. 2

1. Likelihood of Success on the Merits

To establish a likelihood of success on the merits, a plaintiff "need not show that success is certain, only that the probability of prevailing is 'better than fifty percent.'" *BigStar Entm't, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000) (quoting *Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)). Accordingly, the Court

5

need not determine that Greenlight and Gralnick *have* succeeded on the merits to issue an injunction. It need only decide that they *likely may*.

Section 14 of the Exchange Act governs shareholder proxy solicitations for publicly traded companies and was enacted in "the congressional belief that 'fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange.'" *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) (quoting H.R. Rep. 73-1383, at 13 (1934)); *see* 15 U.S.C. § 78n. In an effort to achieve that purpose, the SEC adopted "unbundling" rules, which govern the substance and form of proxy solicitations. Rule 14a-4(a)(3), governing substance, requires that "[t]he form of proxy . . . [s]hall identify clearly and impartially *each separate matter intended to be acted upon*, whether or not related to or conditioned on the approval of other matters." 17 C.F.R. § 240.14a-4(a)(3) (emphasis added). Rule 14a-4(b)(1), governing form, requires that shareholders be given "an opportunity to specify by boxes a choice between approval or disapproval of, or abstention with respect to *each separate matter referred to therein as intended to be acted upon*." 17 C.F.R. § 240.14a-4(b)(1) (emphasis added). Thus, the "unbundling" rules, by their plain terms, "require distinct voting items on 'each separate matter'" in a management proposal. *Koppel v. 4987 Corp.*, 167 F.3d 125, 138 (2d Cir. 1999) (quoting 17 C.F.R. § 240.14a-4(a)(3), (b)(1)). "[W]hat constitutes a 'separate matter' for purposes of the two rules is ultimately a question of fact to be determined in light of the corporate documents and in consideration of the SEC's apparent preference for more voting items rather than fewer." *Id.*

Indisputably, if the items in Proposal No. 2 constitute "separate matters" for shareholder consideration, they must be unbundled into separate voting items. However, the question of what, precisely, constitutes a "separate matter" has received scant attention from the courts. Instead, the regulatory treatment of the rules provides the principal guidance. Passed in 1992 as part of a package of proxy amendments, the "unbundling" rules serve a dual purpose: "to permit shareholders to [(1)] communicate to the board of directors their views on each of the matters put to a vote, and [(2)] not be forced to approve or disapprove a package of items and thus approve matters they might not if presented independently." Securities Exchange Act Release No. 34-30849, 1992 WL 151037, at *6 (Jun. 23, 1992). Accordingly, management may not propose several, aggregated charter amendments "by treating them . . . as [one] vote on the restatement of corporate documents," but it may combine "ministerial or technical matters" that do not alter substantive shareholder rights. Randall S. Thomas & Catherine T. Dixon, *Aranow & Einhorn on Proxy Contests for Corporate Control* ("*Proxy Contests*") § 9.01, at 9-23, 9-24 (3d ed. 1999 Supplement) (citing unmemorialized SEC guidance).

Given the language and purpose of the rules, it is plain to the Court that Proposal No. 2 impermissibly bundles "separate matters" for shareholder consideration. Even ignoring the mere formulation of Proposal No. 2 as four distinct changes, which "alone suggests the[ir] separability," *Koppel*, 167 F.3d at 138, the present bundling of items forces shareholders, including Greenlight and Gralnick, to "approve or disapprove a package of items and thus approve [or disapprove] matters they [would] not if presented independently," Securities Exchange Act Rel. No. 34-30849, 1992 WL 151037, at *6 (Jun. 23, 1992). Further, the bundling denies shareholders like Greenlight and Gralnick the ability to "communicate to

6

the [Board] their views on each of the matters put to a vote." *Id.*

Apple endeavors to avoid that finding by arguing that Proposal No. 2 complies with the "unbundling" rules because it (a) offers only one matter for consideration – whether to amend the Articles; (b) is in keeping with common proxy practice; (c) has not been challenged by the SEC; (d) does not group "material" matters – that is, matters affecting substantive shareholder rights; and (e) does not pair pro-shareholder amendments with provisions harming shareholder interests. (Opp'n to Green. 12-16.) Apple's arguments are unavailing.

### a. Proposal No. 2's Purpose of Amending the Articles

Apple argues that "Proposal No. 2 does not constitute improper 'bundling' [because] . . . shareholders are only being asked one thing – whether to amend the Articles." (*Id.* at 12.) But it is irrelevant that Proposal No. 2 is limited to amending the Articles – it presents four separate amendments for consideration that, unless ministerial or technical, require separate shareholder votes. Holding otherwise would preclude application of the "unbundling" rules to all but the most egregious proxy packaging, and would ignore the information-forcing benefit of permitting separate votes on separate amendments.

### b. Common Proxy Practice

Apple also contends that "[m]any proxy statements have combined into a single proposal changes to eliminate authority to issue 'blank check' preferred stock together with other charter amendments." (*Id.* at 13.) However, the fact that other companies have bundled similar proposals in their proxy statements is of no moment as none of the proxy statements cited by Apple have been held to comply with SEC rules. There is a vast difference between compliant proxies and non-compliant but unchallenged proxies, and the latter proxies are irrelevant to this Court. Apple cites no case law or regulatory authority endorsing such bundling proposals; consequently, Apple's assertion regarding "other charter amendments" offers no guidance with respect to this matter.

### c. SEC Inaction

Apple next presses the Court to infer compliance from the SEC's inaction, particularly because Apple "specifically highlight[ed]" Proposal No. 2 in its December 2012 submission to the SEC. (*Id.* at 12); *see Sherman v. Posner*, 266 F.Supp. 871, 874 (S.D.N.Y.1966) (stating that "[SEC] inaction . . . is to be accorded some weight where . . . the information which forms the basis for an injunctive motion previously has been brought to the attention of the [SEC] and the [SEC] has presumably approved issuance of the material"). The Court declines to draw such an inference. First, as the SEC's own regulations make clear, "[t]he fact that a proxy statement, form of proxy[,] or other soliciting material has been filed with or examined by the [SEC] shall not be deemed a finding by the [SEC] that such material is accurate or complete or not false or misleading, or that the [SEC] has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders." 17 C.F.R. § 240.14a-9(b). Indeed, the "SEC has made clear . . . that it needs private actions as a supplement to its efforts to enforce Rule 14a-4's separate matter requirement due to its limited staff resources." *Koppel*, 167 F.3d at 136 (internal quotation marks omitted). More importantly, even assuming, like the district court in the 1966 *Sherman* decision, that the SEC's silence should be accorded "some

7

weight," the fact remains that the Court is not "relieved of its obligation to exercise its independent judgment as to whether the [proxy materials] complied with [SEC rules]." *Pabst Brewing Co. v. Jacobs*, 549 F. Supp. 1068, 1076 (D. Del. 1982) (ordering relief where proxy materials likely violated SEC rules). Here, regardless of the SEC's inaction, the Court believes that the proxy materials are plainly noncompliant with the clear requirements of Rule 14a-4.

### d. "Material" Matters

Apple's next argument, that the amendments are "technical" or "ministerial" and thus not subject to the bundling requirement, is equally unavailing given the amendments at issue in Proposal No. 2. (Opp'n to Green. 14-16.) As an initial matter, Apple's argument that the "blank check" amendment is not material strains reason. (*Id.* at 16.) Apple asserts that the amendment is not material because the Board would not issue preferred stock without shareholder approval, regardless of its "blank check" authority. That is, "the Board has effectively said – by unanimously voting to present the ['blank check'] proposal to shareholders – that it would seek shareholder approval before issuing preferred stock." (*Id.*) Of course, the Board has said no such thing. It is true that Apple's Board has demonstrated restraint in using its "blank check" authority, but declining to use power does not amount to elimination of that power. There is no reason to believe that a future Board, or even this Board, could not be persuaded to use its "blank check" authority to free capital. Further, the very existence of this action and the merits debate over the amendment suggests that elimination of the "blank check" provision is indeed material. (*See* Green. Reply at 3.)

Apple's next assertion – that the remaining items are not material and thus Proposal No. 2 is in compliance – presents a closer question, but is also unpersuasive. First, it is far from obvious that the director term and par value items are merely immaterial, "technical" amendments. Apple posits that they are not material because the former merely formalizes an already adopted proposal, while the latter concerns a nominal value change not affecting shareholder rights. Accordingly, Apple claims, shareholders may cast their votes on Proposal No. 2 on the basis of the "blank check" amendment alone. (Opp'n to Green. 15-16.) Yet, in the next breath, Apple contradicts its own argument. Apple states that the director term change is required to conform the Articles to California law, and in contesting irreparable harm, claims that an injunction would burden Apple and its shareholders due to lost reductions in fees expected from the par value change. (*Id.* at 3, 16, 20-21.) Thus, by Apple's admission, Proposal No. 2 forces shareholders who oppose the "blank check" amendment to either vote in support of the entire package – registering a false vote in favor of the preferred stock change – or vote down the entire proposal – risking a failed Board election and increased fees. Of course, the "unbundling" rules were intended to prevent just such a dilemma. Moreover, in reviewing Proposal No. 2, one proxy advisory service deemed the director term the "most significant of the proposed changes" (Decl. of Gene D. Levoff, dated Feb. 13, 2103, Green. Doc. No. 16 ("Levoff Decl."), Ex. E at 10), while another stated that, though "two of the proposed amendments are primarily technical in nature, two others – those involving the implementation of majority voting and the elimination of 'blank check' preferred stock – warrant further analysis" (*id.* Ex. F at 8).

Finally, even if Proposal No. 2's remaining items *were* purely technical, it is not apparent that that would excuse compliance with the "unbundling" rules. Permitting Apple to bundle numerous "technical" matters with a single material matter would appear to still violate the letter of the law – which calls for separate votes for "separate matters" – as well as its spirit, because shareholders voting on the "blank check" amendment might still be swayed by the presence of the remaining items such that the resulting vote would not communicate a clear message on the actual popularity of the "blank check" item.

For all these reasons, Apple's materiality argument is easily rejected.

### e. "Pro-Shareholder" Nature of the Amendments

Apple's final argument, that Proposal No. 2 does not violate the "unbundling" rules because its amendments are all "pro-shareholder," misapprehends the rules. First, coercive manipulation of shareholder votes is only one of the evils addressed by the "unbundling" rules. Another purpose is to "permit shareholders to communicate to the board of directors their views on each of the matters put to a vote," a benefit plainly squelched by grouping the director term, par value change, and "blank check" amendments under one heading. Securities Exchange Act Release No. 34-30849, 1992 WL 151037, at *6 (Jun. 23, 1992). Further, the rules do not address *intentional* coercion alone. Instead, the rules require that shareholders "not be forced to approve or disapprove a package of items and thus approve matters they might not if presented independently." *Id.* Thus, application of the "unbundling" rules does not rest on *management's* view of the benefits of an amendment – for the simple reason that it is *shareholders*, and not boards of directors, who have the exclusive right to decide what is, in fact, truly "pro-shareholder." Here, Greenlight and Gralnick oppose the "blank check" amendment on the grounds that it potentially undermines the value of Apple stock. Thus, to Greenlight and Gralnick, the amendment is *anti*-shareholder – a view they must be permitted to register. Moreover, even if there were a "pro-shareholder" exception to the "unbundling" rules, it is not clear that Proposal No. 2 would fall under that exception. As stated, Greenlight and Gralnick oppose the "blank check" amendment; following Greenlight's suit, other shareholders have voiced similar opposition (Green. Reply 3); at least one proxy advisory service recommended a "no" vote on the amendment because it "could frustrate use by the [B]oard of a useful tool to unlock shareholder value" (*id.* at 2-3); and even proxy advisory services that endorsed Proposal No. 2 found that Apple's bundling went against shareholder interests (*id.* at 3; Levoff Decl. Ex. F at 8 (quoting proxy advisory service report finding that "[Apple] has elected to bundle multiple article amendments into a single proposal, a practice which we believe negatively affects shareholders as it prevents them from judging each amendment on its own merits").) Accordingly, Apple's view, sincere or not, that Proposal No. 2 is "pro-shareholder" has absolutely no bearing on the Court's analysis of the SEC's "unbundling" rules.

\* \* \*

Given the disparate, material nature of the items in Proposal No. 2, it is probable that Apple has improperly bundled four "separate matters" for a single vote. The Court thus concludes that Greenlight and Gralnick have established a "probability of prevailing [that] is 'better than fifty percent'"

9

and are likely to succeed on the merits of their claims regarding Proposal No. 2.

### 2. Irreparable Harm

A finding of "irreparable harm" requires "an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (internal quotation marks omitted). While a "showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction," *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks omitted), "'the decision to grant or to deny a preliminary injunction depends in part on a flexible interplay between the likelihood of success and irreparable harm,'" *XL Specialty Ins. Co. v. Level Global Investors, L.P.*, 874 F. Supp. 2d 263, 270-71 (S.D.N.Y. 2012) (quoting *Packard Instrument Co. v. ANS, Inc.*, 416 F.2d 943, 945 (2d Cir. 1969)). Accordingly, a clear likelihood of success on the merits requires a relatively lesser showing of harm.

The Second Circuit has considered irreparable harm in connection with proxy votes, stating that "[i]n passing Section 14(a), Congress sought to avoid a very particular harm – the solicitation of shareholder proxies without adequate disclosure. The SEC rules promulgated under Section 14(a) are intended to level somewhat the playing field for proxy contestants and to force disclosures that promote informed shareholder voting." *MONY Grp., Inc. v. Highfields Capital Mgmt., L.P.*, 368 F.3d 138, 147-48 (2d Cir. 2004). Thus, "[i]t is well-established that a transaction . . . that is influenced by noncompliance with the disclosure provisions of the various federal securities laws can constitute irreparable harm." *Id.* at 147. In that vein, the Second Circuit has found that "[i]mpermissible grouping of voting items [in violation of Rule 14a-4] frustrates fair corporate suffrage and the voting rights of shareholders *no less than* a misrepresentation or omission in a proxy." *Koppel*, 167 F.3d at 135-36 (emphasis added). Perhaps not surprisingly, when faced with probable violations of proxy rules, the Second Circuit has expressed "a strong preference for an injunctive remedy over damages." *Id.* at 137.

Having carefully reviewed the record before it, the Court finds that Greenlight and Gralnick face irreparable harm if they are compelled to vote on Proposal No. 2 in violation of SEC rules. By voting either against the slate of amendments and thus against two amendments they support, or for the amendments – including the offending "blank check" provision that they oppose – Greenlight and Gralnick will have been forced to vote on a package of items for which they did not have a single position, and denied the right to inform management of their views on specific items. (Green. Mem. 9; Gral. Mem. 8.)

Apple's arguments in opposition fundamentally misunderstand the harm alleged. For instance, Apple insists that there is no irreparable harm because the "blank check" amendment will not eliminate the company's power to issue preferred stock. (Opp'n to Green. 17-18.) But the harm is that Greenlight and Gralnick will be forced to cast an unrepresentative and illegal vote, not that they might be denied their desired substantive outcome. Apple's contention that any harm is mooted because shareholders could reinstate the "blank check" provision through a later proxy vote is likewise beside the point.[3] If

---

[3] Apple also ignores a glaring concern with its proposal: Apple's bylaws count shares that are not voted as opposing amendments. (Green. Reply 8.)

Proposal No. 2 passes, Greenlight and Gralnick will be hampered with an amendment to the Articles that they oppose and which Apple presented illegally. If Proposal No. 2 fails, Greenlight and Gralnick will still have been denied their legal right to an unbundled vote. More importantly, they will have been denied the opportunity to communicate to management the true depth of Proposal No. 2's unpopularity – offending both purposes of the "unbundling" rules.[4]

In addition, the Court concludes that any lesser remedy would fail to provide Greenlight and Gralnick with adequate relief. Significantly, the Second Circuit states a strong preference for injunctive relief in the proxy context. *Koppel*, 167 F.3d at 137-38. Not surprisingly, the parties agree that no monetary damages apply. (Tr. 10:9-15.) Further, if the Court were to issue an injunction at a later date, it is unclear whether or how Apple could unwind shareholder-ratified amendments to its Articles – amendments that may trigger filings with the California Secretary of State, as well as multiple other states' agencies regarding the par value amendment. (Tr. 12:2-16.)

Thus, the Court does not conclude, as Apple suggested at oral argument, that any violation of an SEC rule is a *per* se harm. (Tr. 30:16-20.) Instead, the Court finds on the facts before it that a vote on Proposal No. 2 would compel Greenlight and Gralnick to vote against their interests, and that the consequences stemming from a vote on Proposal No. 2 would be, to borrow a phrase repeatedly invoked by the parties at oral argument, an exceedingly difficult "egg" to "unscramble." (Tr. 30:20-22.) Accordingly, the Court finds that Greenlight and Gralnick have established irreparable harm, particularly in light of their strong likelihood of success on the merits. *See XL Specialty Ins. Co.*, 874 F. Supp. 2d at 270-71.

### 3. Balance of the Hardships

"[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999). Here, the balance of hardships tips in Greenlight's and Gralnick's favor, as a denial of their motions would prevent them and thousands of other Apple shareholders from exercising "fair corporate suffrage," whereas granting their motions will merely require Apple to come into compliance with Rules 14a-4(a)(3) and (b)(1) – at an earlier date than would otherwise inevitably result at the conclusion of this action.

---

Accordingly, any shares not voted on Proposal No. 2 would count *against eliminating* the "blank check" authority. But any shares not voted on a future, restorative amendment would count *against reinstating* the "blank check" authority. Thus, the deck would be stacked against Greenlight and Gralnick in any effort to restore the status quo with respect to the issuance of preferred stock.

[4] Nevertheless, the Court *does* agree with Apple that Greenlight and Gralnick were slow to bring suit, waiting six weeks after the preliminary proxy materials were released to file their actions. (*See* Opp'n to Green. 19 (citing *Appalseed Prods., Inc. v. MedianetDigital, Inc.*, 2012 WL 2700383, at *10 (S.D.N.Y. July 6, 2012); *Grout Shield Distribs., LLC v. Elio E. Salvo, Inc.*, 824 F. Supp. 2d 389, 403 (E.D.N.Y. 2011).) However, this fact alone is not fatal to their motions. While the delay weighed heavily in the Court's analysis given the time and expense that might have been spared had they acted before the Proxy Statement and Proxy Card were released, the lapse of time is not so "unreasonable" as to support denial of their motions. First, the cases Apple cites involve situations in which plaintiffs waited many months and even years, not weeks, before seeking judicial intervention. Second, those cases deal in continuing harms where the plaintiffs plainly acquiesced to the injury. Here, the injury identified by Greenlight and Gralnick has not yet occurred – and may yet be prevented – making a preliminary injunction the proper form of relief.

Apple strenuously objects that an injunction would mark "an unprecedented interference [into] the exercise of corporate suffrage by one of the most respected companies in America." (Tr. 32:3-5.) But Apple fails to acknowledge that this "interference" occurred more than ten years ago when the SEC adopted the "unbundling" rules; the Court now simply requires compliance with the clear dictates of those rules. Apple further argues that its own costs will be sizeable – approximately $3 million to amend and reissue the proxy materials for a special vote after the annual shareholder meeting. (Tr. 40:3-6.) However, this cost is a direct result of Apple's failure to comply with SEC rules, represents a tiny sum for a company worth approximately $400 billion, and may be avoided if Apple delays consideration of the items in Proposal No. 2 until its next shareholder meeting. (*See* Green. Reply 9.) Apple also claims that a delayed vote on Proposal No. 2 would impose a "serious financial burden" on it and its shareholders due to the loss of expense reductions expected from the par value change.[5] (Opp'n to Green. 20-21.) While that may be the case, it would be perverse to permit Apple to proceed with a bundled proxy vote merely because it desires quick passage of one of the items it chose to bundle.

Accordingly, the Court finds that Greenlight and Gralnick have established that the balance of the hardships tips in their favor.

4.  The Public Interest

"[T]he public interest and investor protection are well-served when persons faced with solicitations that do not comply with the proxy rules are able to go to court to obtain equitable relief to assure that their opponents play by those rules." Amicus Brief of the SEC, *Koppel*, 167 F.3d 125, 1998 WL 34088514, at *15-16. Accordingly, an injunction to force compliance with the securities laws is in the public interest. Apple insists that Proposal No. 2's "pro-shareholder" bent – to increase shareholder suffrage – is in the public interest and, therefore, the vote should not be barred. (Opp'n to Green. at 21-22.) However, as noted above in connection with Apple's arguments concerning likelihood of success on the merits, this is precisely the type of substantive judgment that the "unbundling" rules require be left to shareholders, not to courts and certainly not to boards of directors. Because the bundling in Proposal No. 2 denies Apple's shareholders that opportunity, the Court finds that an injunction would be in the public interest.

\* \* \*

For the foregoing reasons, the Court concludes that Greenlight and Gralnick are likely to succeed on the merits and face irreparable harm if the vote on Proposal No. 2 is permitted to proceed. Further, the Court finds that the balance of hardships tips in Greenlight's and Gralnick's favor, and that a preliminary injunction would be in the public interest. Accordingly, Greenlight's and Gralnick's motions for a preliminary injunction regarding Proposal No. 2 are granted, and Apple is hereby enjoined from (1) certifying or accepting proxy votes cast in connection with Proposal No. 2, (2) amending its Articles based on such votes, or (3) proceeding with its shareholder meeting in violation of SEC rules.[6]

---

[5] As discussed, Apple's insistence that a delayed vote on the par value change would impose serious hardship on the company undermines Apple's assertions as to the amendment's purported lack of materiality.

[6] This relief does not prevent Apple from holding its annual shareholder meeting. Instead, it is limited only to enjoining a vote on Proposal No. 2 at that meeting or Apple's taking any related action.

B. Proposal No. 4

1. Likelihood of Success on the Merits

Enacted as part of the Dodd-Frank Act in 2010, 15 U.S.C. § 78n-1(a) requires that companies conduct a non-binding shareholder vote on executive compensation at least once every three years. This "say-on-pay" vote was intended "to empower shareholders" by giving them "the ability to hold executives accountable, and to disapprove of misguided incentive schemes." *Laborers' Local v. Intersil*, 868 F. Supp. 2d 838, 848 (N.D. Cal. 2012) (quoting Hearing on Executive Compensation Oversight Before the H. Comm. on Fin. Servs. (Sept. 24, 2010) (statement of Rep. Barney Frank, Chairman, H. Comm. on Financial Services) and 156 Cong. Rec. S5902–01, S5916 (2010) (statement of Sen. Jack Reed)). Item 402(b) of Regulation S-K, promulgated thereunder, requires that, prior to a "say-on-pay" vote, companies must "[d]iscuss the compensation awarded to, earned by, or paid to the named executive officers[;] explain all material elements of the registrant's compensation of the named executive officers[; and] describe . . . [h]ow the registrant determines the amount (and, where applicable, the formula) for each element to pay." 17 C.F.R. § 229.402(b)(1)(v). The rule does not impose fiduciary duties or require certain methods for determining compensation. *See* 15 U.S.C. § 78n-1(c). However, it does give rise to a violation of the Exchange Act for failure to disclose "if either the SEC requirements specifically require disclosure of the omitted information in a proxy statement, *or* the omission makes statements in the proxy statement materially false or misleading." *Vides v. Amelio*, 265 F. Supp. 2d 273, 276-77 (S.D.N.Y. 2003) (internal quotation marks omitted) (discussing CEO compensation). For an omission to be material, there must be "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *See Hutchison v. Deutsche Bank Secs. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011).

Consistent with SEC rules, Proposal No. 4 seeks shareholder advisory votes to approve Apple's executive compensation scheme for fiscal year 2012.[7] (Gral. Mem. 2; Green. Compl. Ex. A 47-49; Opp'n to Gral. 4.) In addition, the CD&A in the Proxy Statement describes Apple's executive compensation scheme. Spanning sixteen pages, the CD&A details the amount of compensation awarded; states the types of awards, including long-term equity awards, cash bonuses, and base salaries; and sets out the guideposts for compensation, including "exceptional personal performance," "internal equity," and the input of Apple CEO Cook. (Green. Compl. Ex. A 25-42.) The CD&A also lists the members of the Compensation Committee, along with their backgrounds and qualifications; describes Apple's independent compensation consultant and details its role in the compensation process; and identifies the peer firms considered in connection with Apple's compensation decisions, as well as the criteria used in selecting those firms. (*Id.*)

The report devotes substantial attention to Apple's long-term equity awards – granted in the form of RSUs – which account for the "majority" of Apple's executive compensation. As noted above, the CD&A specifically provides that:

> The Compensation Committee's determination of the size of the RSU awards was a subjective

---

[7] Apple recommended that shareholders adopt an annual "say-on-pay" requirement, exceeding the three year SEC requirement, which they did in 2011. (*See* Decl. of Abby F. Rudzin, dated Feb. 13, 2013, Green. Doc. No. 18 ("Rudzin Decl."), Ex. G at 2.)

13

determination. The Compensation Committee believed that the RSU awards should be meaningful in size in order to retain [Apple's] executive team during the CEO transition. There was no formula or peer group "benchmark" used in determining these awards. Rather, the size of the awards was the result of the Compensation Committee's business judgment, which was informed by the experiences of the members of the Committee, the Committee's assessment of [Apple's] performance, the input received from [Apple CEO] Cook, as well as the input and peer group data provided by [Apple's executive compensation consultant].

(Green. Compl. Ex. A 30.) Nevertheless, Gralnick alleges that this disclosure is insufficient under the SEC "say-on-pay" rules. In particular, Gralnick faults the report for failing to: identify the Compensation Committee's pertinent "experiences" and "assessment[s]," detail the "input" provided by Apple CEO Cook, and explain the "peer group data" used to determine RSU awards. (Gral. Compl. ¶ 24.) Without such information, Gralnick alleges, Apple's shareholders cannot make an informed vote on Apple's executive compensation, particularly with respect to the sizeable and uniform RSU awards. (*Id.* at ¶ 25; Gral. Mem. 7-8.) As set forth below, the Court disagrees, and finds that the depth and breadth of information disclosed by Apple in the Proxy Statement is plainly sufficient under SEC rules.[8]

Gralnick asserts that Apple has not disclosed the Compensation Committee's "experiences" informing its judgment. Yet, the CD&A lists the Compensation Committee members as well as their backgrounds and qualifications – that is, their "experiences." (Green. Compl. Ex. A 13-15.) Gralnick further claims that Apple has not disclosed the Compensation Committee's "assessment" of the company's performance. However, the CD&A states that "in 2012, [Apple] had the highest market capitalization, revenue growth, and operating income growth of any of the peer companies" – a glowing "assessment" underpinning the "strong financial performance" the Compensation Committee rewarded in 2012. (*See id.* at 29, 31.) Gralnick continues that the description of Apple CEO Cook's input in the process is lacking. But the CD&A describes Cook's input as "regarding the performance and appropriate compensation of the other named executive officers" to which the Compensation Committee gives "considerable weight . . . because of [Cook's] direct knowledge of each executive officer's performance and contributions." (*Id.* at 28.) In like fashion, Gralnick questions the CD&A's failure to disclose the "peer group data" considered in connection with the named executive's compensation, while ignoring that the CD&A (1) describes Apple's executive compensation consultant as contributing "a range of external market factors, including evolving compensation trends, appropriate peer companies and market survey data"; (2) lists the peer firms considered in setting Apple's executive compensation; and (3) details the criteria for selecting those firms. (*Id.*) Finally,

---

[8] It is worth noting that Gralnick does not cite any other complaints regarding the adequacy of the CD&A disclosures. Indeed, one proxy advisory service that recommended approval of Proposal No. 4 stated that it had "thoroughly reviewed [Apple's CD&A], as well other relevant SEC filings[, and u]pon review of [Apple's] complete executive compensation program, [fou]nd that [Apple] ha[d] provided adequate disclosure with regard to both its short-term and long-term incentive arrangements." (Levoff Decl. Ex. F at 15.) Another service that opposed Proposal No. 4 did so on the merits – not because it lacked information to make a recommendation. (*Id.* Ex. E at 18.)

Gralnick appears incredulous that Apple would reward its top executives so handsomely and in equal shares. (Tr. 21:13-17.) However, the CD&A pointedly states that Apple compensates based on "exceptional personal performance," as reflected by Apple's impressive success, as well as "internal equity," explaining the similarly sized awards "intended to promote and retain stability within the executive team." (Green. Compl. Ex. A 29-31.) Finally, the CD&A made clear that executive compensation was set as it was in an attempt to "retain [Apple's] executive team during the CEO transition" – referring to Apple CEO Steve Jobs's resignation and death, and Cook's elevation to CEO – a period of transition and potential turmoil that would explain outsized awards. (*Id.*) Put simply, Gralnick's complaint that the CD&A leaves shareholders "totally in the dark" on executive compensation is entirely without basis. (Tr. 21:13.)

Indeed, Gralnick concedes that the SEC "say-on-pay" rules do not require Apple to adopt a formula or rational method for determining executive pay. (Tr. 22:20-23:3.) But Gralnick nowhere points to any additional information Apple was *required* to release to explain its admittedly "subjective" RSU compensation method, nor does he identify any material omissions that rendered the CD&A false or misleading. (Opp'n to Gral. 14; *see* Gral. Mem. 6-8.) Thus, because Gralnick has failed to identify *any* material omission in the Proxy Statement, and because the CD&A appears to be wholly compliant with Item 402(b) of Regulation S-K, the Court finds that Gralnick is unlikely to succeed on the merits of his claim regarding Proposal No. 4. For the same reasons, the Court concludes that Gralnick has failed to establish "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Salinger*, 607 F.3d 68 at 79.

\* \* \*

Although the Court concludes that Gralnick would be similarly unable to meet his burden regarding the remaining factors relevant to the preliminary injunction analysis – irreparable harm, balance of equities, and public interest – the Court need not reach those questions given his failure to establish the first element, likelihood of success on the merits. *See eBay Inc.*, 547 U.S. at 391. Accordingly, Gralnick's motion regarding Proposal No. 4 is denied.

IV. CONCLUSION

For the reasons stated above, the Court finds that Greenlight and Gralnick have demonstrated by a "clear showing" that they have satisfied the elements for a preliminary injunction regarding Proposal No. 2. Accordingly, their motions regarding Proposal No. 2 are GRANTED, and Apple is HEREBY ENJOINED from (1) certifying or accepting proxy votes cast in connection with Proposal No. 2, (2) amending its Articles based on such votes, or (3) proceeding with its shareholder meeting in violation of SEC rules concerning Proposal No. 2. However, the Court finds that Gralnick has not demonstrated by a "clear showing" that he satisfies the elements for a preliminary injunction regarding Proposal No. 4. Accordingly, his motion regarding Proposal No. 4 is DENIED.

Further, pursuant to Federal Rule of Civil Procedure 65(c), a preliminary injunction must be secured by "an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, Apple does not state an appropriate amount for a bond, nor does it request one. Accordingly, the Court will not order

Greenlight and Gralnick to post a bond at this time.

Finally, IT IS HEREBY ORDERED THAT, no later than March 1, 2013, the parties shall submit a joint letter outlining the next contemplated steps in this case, as well as a joint proposed case management plan and scheduling order. A template can be found at http://nysd.uscourts.gov/cases/show.php?db=judge_info&id=347.

SO ORDERED.

*signature*

RICHARD J. SULLIVAN
United States District Judge

Dated: February 22, 2013
       New York, New York

\* \* \*

Greenlight is represented by Ashley F Waters, Christopher Michael Egleson, Michael A. Asaro, and Mitchell P. Hurley, Esqs., of Akin Gump Strauss Hauer & Feld, One Bryant Park, New York, New York 10036.

Gralnick is represented by A. Arnold Gershon, Michael Arthur Toomey, and William J. Ban , Esqs., of Barrack, Rodos & Bacine, 425 Park Avenue, Suite 3100, New York, New York 10022, as well as Jeffrey Alan Barrack, Esq., of Barrack, Rodos & Bacine, Two Commerce Square, 2001 Market Street, Suite 3300, Philadelphia, Pennsylvania 19103.

Apple is represented by Andrew Jay Frackman and Abby Faith Rudzin, Esqs., of O'Melveny & Myers LLP, 7 Times Square, New York, New York 10036.

16